UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHARON CAMPBELL,                                                REPORT
                                 Plaintiff,                        and
                          v.                               RECOMMENDATION

                                                           13-CV-00438-W(F)

NATIONAL FUEL GAS DISTRIBUTION CORPORATION,

                                 Defendant.
_____

APPEARANCES:        SANDERS & SANDERS
                    Attorneys for Plaintiff
                    HARVEY P. SANDERS, of Counsel
                    401 Maryvale Drive
                    Cheektowaga, NY 14225

                    BOND, SCHOENECK & KING, PLLC
                    Attorneys for Defendant
                    MELINDA G. DISARE, and
                    MICHAEL E. HICKEY, of Counsel
                    Avant Building, Suite 900
                    200 Delaware Ave.
                    Buffalo, NY14202


                          **<u>JURISDICTION</u>**

        This case was referred to the undersigned by Honorable Richard J. Arcara on

July 8, 2013, for pretrial matters including preparation of a report and recommendation

on dispositive motions. The matter is presently before the court on Defendant's motion

for summary judgment (Doc. No. 28), filed November 3, 2014.

## BACKGROUND

On April 29, 2013, Plaintiff Sharon Campbell ("Plaintiff" or "Campbell") commenced this action alleging her employer, National Fuel Gas Distribution Corporation ("Defendant" or "National Fuel") subjected her to gender-based employment discrimination and a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). On November 3, 2014, Defendant filed the instant motion for summary judgment (Doc. No. 28) ("Defendant's motion"), supported by the attached Statement of Material Facts Pursuant to Local Rule 56.1 (Doc. No. 28-1) ("Defendant's Statement of Facts"), the Memorandum of Law in Support of Defendant's Motion for Summary Judgment (Doc. No. 28-2) ("Defendant's Memorandum"), the Affidavit of Melinda G. Disare, Esq. (Doc. No. 28-3) ("Disare Affidavit"), exhibits A through O (Doc. Nos. 28-4 - 23-9) ("Defendant's Exh(s). __"), the Affidavit of Russell Jandreau (Doc. No. 28-10) ("Jandreau Affidavit"), exhibits A through C (Doc No. 28-11) ("Jandreau Exh(s). __"), the Affidavit of James Ramsdell (Doc. No. 28-12) ("Ramsdell Affidavit"), and the Affidavit of Keith Richards (Doc. No. 28-13) ("Richards Affidavit").

In opposition to Defendant's motion, Plaintiff filed on January 9, 2015, the Declaration in Opposition to Defendant's Summary Judgment Motion (Doc. No. 33) ("Plaintiff's Response"), with attached exhibits 1-15 (Doc. Nos. 33-1 - 33-15) ("Plaintiff's Exh(s). __"), the Declaration of Sheryl Canfield (Doc. No. 34) ("Canfield Declaration"), the Declaration of Jacqueline Henrich (Doc. No. 35) ("Henrich Declaration"), and the Declaration of John Obarka (Doc. No. 36) ("Obarka Declaration").

In further support of summary judgment, Defendant filed on February 6, 2015, the Reply Affidavit of Catherine Creighton, Esq. (Doc. No. 51) ("Creighton Reply Affidavit"), with attached exhibit A (Doc. No. 51-1), and the Reply Affidavit of Gary C. Holly (Doc. No. 52) ("Holly Reply Affidavit"), with attached exhibit A. Defendant filed on February 10, 2015, the Reply Affidavit of Melinda G. Disare, Esq. (Doc. No. 54) ("Disare Reply Affidavit"), the Reply Affidavit of Russell Jandreau (Doc. No. 55) ("Jandreau Reply Affidavit"), the Reply Affidavit of Keith Richards (Doc. No. 56) ("Richards Reply Affidavit"), and the Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment (Doc. No. 57) ("Defendant's Reply"). Based on the following, Defendant's motion should be GRANTED.

## **FACTS**[1]

Plaintiff Campbell commenced employment with Defendant National Fuel on March 4, 1999 as a meter reader. Plaintiff was a meter reader for at least five years before she bid on and was awarded a serviceperson job at Defendant's Servicenter in Orchard Park. For two or three years prior to 2009, Sheryl Canfield ("Canfield") was Plaintiff's direct supervisor. Beginning in early 2009 until Plaintiff's termination from employment, effective March 15, 2012, Assistant General Foreman Russell Jandreau ("Jandreau") was Plaintiff's direct supervisor. Plaintiff was a member of a bargaining unit represented by IBEW, AFL-CIO, Local Union 2154 ("Union") until her termination from employment.

As a serviceperson, Plaintiff worked each day from 7:00 A.M. to 3:30 P.M. with a half-hour lunch break. After Plaintiff received her work assignments at the beginning of

---

[1] Taken from the pleadings and motion papers filed in this action.

her shift, she typically spent the balance of the day outside the office working on the various assignments. Servicepersons are assigned a company-owned truck to investigate leaks at customers' premises, conduct safety inspections of gas-fired appliances, gas meters and gas pipelines, and perform meter reads. Servicepersons are also assigned a Mobile Personal Computer ("MPC") to access work assignments, record progress (including recording when each task is completed and any related remarks), and edit timesheets.

On January 26, 2012, Plaintiff completed her scheduled serviceperson work for the day by 9:42 A.M. Plaintiff's supervisor, Jandreau, had assigned Plaintiff a list of meter reads to perform as "fill-in work." This was the first time Jandreau had assigned Plaintiff a full meter reading route as a serviceperson, and no other serviceperson had been assigned a meter reading route that day. According to Plaintiff, Jandreau said there was no rush to do the reads and to complete as many as she could. Although Plaintiff had asked Jandreau for an ITRON, a hand-held device that meter readers use to automatically record reads, Jandreau did not give her one. Plaintiff thus had to record reads by returning to her vehicle after each read to enter it into her MPC, which could not be carried house-to-house, or record each read on a piece of paper to be entered into her MPC at a later time. Plaintiff maintains she was not trained how to record meter reads on paper. When Plaintiff asked Jandreau how he wanted her to record the reads, Jandreau said, "You'll figure it out." Campbell Declaration ¶ 38. Both ITRONs and MPCs record the same information, meter reads.

Between 9:42 A.M. and 10:45 A.M., Plaintiff visited eight homes and entered six meter reads from houses located closely together on the same street. According to

Jandreau, a serviceperson should be able to read approximately thirty meters under such time and geographical conditions. Plaintiff used a sheet of paper to record the reads but did not note the time at which each read was taken. After Plaintiff responded to an emergency call made at 10:43 A.M., she entered the six meter reads she took that morning as completed at 10:45 A.M. Plaintiff maintains her timesheet was not accurate as to when the meter reads actually occurred because Plaintiff was not trained how to record reads on paper, Jandreau said there was no rush to conduct the reads, and Plaintiff had to respond to an emergency call. Plaintiff then recorded her half-hour lunch break on her timesheet as starting at 11:25 A.M. and ending at 11:55 A.M. According to a computer report reviewed by Jandreau, which cannot be manipulated by Plaintiff, Plaintiff actually took a 42-minute lunch break starting at 11:18 P.M. and ending at 12:00 P.M.

After her lunch break, Plaintiff responded to another serviceperson job, which she completed at 12:37 P.M. From 12:37 P.M. until 2:30 P.M., Plaintiff attempted approximately thirty-two meter reads from houses located on two streets in the same neighborhood, entering and obtaining meter reads at only six addresses. For almost all of the other twenty-six addresses, Plaintiff entered "HC" (meaning "House Closed"), indicating she had not entered the house or read the meter. According to Jandreau, visiting so few addresses over the course of several hours is unacceptable and an inefficient use of company time. After 2:30 P.M., Plaintiff did not visit any more addresses to obtain meter reads.

That afternoon, Jandreau contends he had paperwork he needed Plaintiff to complete, although he never provided Plaintiff with paperwork that day or any day thereafter. Jandreau attempted to call Plaintiff on her cell phone to complete the

paperwork, but when Plaintiff did not answer the phone, Jandreau used GPS and located Plaintiff's vehicle at Tim Hortons, a local coffee and donut shop. When Jandreau drove to Tim Hortons to meet Plaintiff, however, she had already left. Plaintiff maintains servicepersons were allowed to stop at gas stations and coffee shops to use the restroom, an assertion corroborated by Jandreau. Campbell Declaration ¶ 88; Plaintiff's Exhibit 4 at 56. After leaving Tim Hortons, Plaintiff went to OfficeMax to purchase printer ink for her home printer, arriving at 2:45 P.M. and staying for three to five minutes. Plaintiff then drove to her house in Hamburg, where Jandreau claims he observed Plaintiff's company vehicle for fifteen minutes from 2:35 P.M. to 2:50 P.M. According to Plaintiff, she stopped at her house for less than one minute to drop off the printer ink at 2:50 P.M., an assertion corroborated by Plaintiff's roommate, Jacqueline Henrich ("Henrich"), who was present when Plaintiff dropped off the ink. Henrich Declaration ¶¶ 5-7. Next, Plaintiff drove to her mother's house in Blasdell, where Plaintiff maintains she visited her mother, who had lung cancer, for five minutes, and left the house at 3:05 P.M. Jandreau claims Plaintiff was at her mother's house until approximately 3:15 P.M. Plaintiff contends she signed off her MPC at 3:14 P.M. when she arrived back at the Orchard Park service center, although Defendant maintains that the action of signing off an MPC can be done at any location, at any time, and Plaintiff signing off at 3:14 P.M. does not mean Plaintiff was back at the service center at the same time. Disare Affidavit ¶ 5.

When reviewing Plaintiff's timesheet for that day, Jandreau noticed Plaintiff's timesheet indicated that she was conducting meter reads during the times Jandreau observed Plaintiff at her house and her mother's house. For example, although Plaintiff

stopped visiting houses to obtain reads after 2:30 P.M., Plaintiff's timesheet shows she entered meter reads for six houses as completed at 3:30 P.M. Plaintiff attributes this discrepancy to having input meter reads from the course of the afternoon into her MPC during her personal stops. Therefore, Plaintiff contends, she continued working after 2:30 P.M.; Jandreau maintains, in contrast, that a meter read can be input into an MPC in a matter of seconds. Jandreau Reply Affidavit ¶ 5. Because it took Plaintiff as little as eight seconds, and, for several entries, between ten and twenty-five seconds, to input these entries at the end of the day, Plaintiff therefore had plenty of time to stop at several more houses after 2:30 P.M. *Id.* In addition to reviewing Plaintiff's timesheet, Jandreau reviewed the list of meter-reading assignments issued to Plaintiff on January 26, 2012, establishing Plaintiff visited thirty-eight of the seventy-eight addresses assigned to her that day.

On January 30, 2012, a meeting was held with Jandreau, Plaintiff, and Plaintiff's union steward, Brett Laubisch ("Laubisch"), to discuss the discrepancies between Plaintiff's timesheet and her whereabouts on January 26, 2012. Jandreau reminded Plaintiff of a previous customer complaint in the summer of 2011 concerning Plaintiff's frequent lunchtime visits to her mother's house, at which time Jandreau told Plaintiff not to visit her mother's house during the work day, including lunch breaks. Plaintiff maintains she continued visiting her mother's house after the June 2011 meeting because Jandreau had indicated he gave no credence to the accusations. Plaintiff further maintains that, six months after the complaint, she asked Jandreau for permission to visit her mother's house, and Jandreau responded by saying he did not care and shrugging his shoulders. Plaintiff admits her relationship with Jandreau

deteriorated after the customer complaint, as evidenced by Jandreau allegedly speaking to Plaintiff less, ignoring her, and treating her as though she were not there.

During the January 2012 meeting, Plaintiff was asked if the times on her timesheet were correct with respect to both the completion times and locations, and Plaintiff responded "yes." Plaintiff also indicated the timing of her half-hour lunch break was accurate. According to Jandreau, Plaintiff was unable to provide logical responses when asked about several other issues on the timesheet. When Jandreau informed Plaintiff that she had been physically observed at the end of the day, Plaintiff continued to assert her timesheet was accurate. It was only when Jandreau informed Plaintiff she was observed at her house and her mother's house during the day, when her timesheet indicated she was working, that Plaintiff finally acknowledged she had visited her house and her mother's house during the work day. Jandreau contends Plaintiff admitted to stopping at Office Max and Tim Hortons only after he "prompted" Plaintiff by informing her she had been observed at her house and her mother's house that day. At the end of the meeting, Jandreau told Plaintiff she was not to conduct personal business during work and that National Fuel would follow up concerning these issues.

The same day, Jandreau prepared a report ("Jandreau's report")[2] regarding what occurred at the meeting and submitted the report to his supervisor, Mike Rogers ("Rogers"), and Labor Relations Manager Keith Richards ("Richards"). Plaintiff maintains supervisors generally handle issues such as employee personal stops or inaccurate meter readings in-house, instead of reporting them up the chain of command, as personal stops were an accepted part of a serviceperson's job and it was

_____

[2] Jandreau Exhibit C.

common practice to manipulate timesheets to maintain a high level of productivity, but that Jandreau decided to report the incident because he did not like working with Plaintiff because she was a woman. Canfield, Plaintiff's previous supervisor, maintains that it was commonplace for employees to misrepresent work times to cover minor personal errands, and supervisors knew about this and did not pursue discipline as long as the work was getting done. Canfield Affidavit ¶¶ 15-16. Plaintiff contends that Jandreau reported Plaintiff falsified documents and misused company time after the union steward, Laubisch, told Jandreau, "That's what gets people terminated." Campbell Declaration ¶ 201. Jandreau maintains he did not include any recommendation regarding the appropriate discipline for Plaintiff's conduct because Jandreau was not authorized in his role as Assistant General Foreman to make a decision or recommendation with regard to disciplinary matters.

After receiving Jandreau's report, Richards conducted an additional review of the matter and consulted with individuals with authority to discipline Plaintiff. Richards Affidavit ¶ 9. James Ramsdell ("Ramsdell"), Chief Safety Officer and Senior Vice President of Defendant ultimately made the decision to terminate Plaintiff's employment. Ramsdell Affidavit ¶ 5.

On February 16, 2012, Richards, Jandreau, and Laubisch met with Plaintiff to inform her she had misused company time for personal business, falsified her timesheet, and lied about her whereabouts during the January 30, 2012 investigatory meeting. Richards noted this was not the first time Plaintiff had engaged in such conduct, and Plaintiff did not deny this observation. Richards informed Plaintiff her employment was terminated as the result of her conduct. Jandreau maintains he had no

involvement in the decision to terminate Plaintiff's employment. However, Plaintiff contends Jandreau controlled the flow of information regarding Plaintiff's employment, thus establishing Jandreau as the "true decision-maker." Plaintiff's Response at 11.

Following the termination meeting, the Union filed a grievance ("Grievance Form")[3] challenging Plaintiff's termination. Grievance Form; Richards Affidavit ¶ 15. Pursuant to Plaintiff's bargaining agreement, a Step 3 grievance meeting was conducted. Richards Affidavit ¶ 16. Following the meeting, Defendant responded to the grievance as follows:

> After careful review of the circumstances surrounding the incident that necessitated the disciplinary action, the Company maintains that it was justified in terminating the Grievant's employment. The Grievant grossly misused Company time for personal business, falsified her time sheet, and was untruthful during the investigatory meeting.

Grievance Form.

After receiving Defendant's response, the Union decided not to arbitrate the grievance. Richards Affidavit ¶ 18. In a letter ("Union's letter")[4] to Plaintiff, the Union stated it investigated the events leading to her discharge and discussed the matter with its labor attorney. Based on such investigation and discussion, it concluded an arbitrator would likely find that "National Fuel had just cause to discipline [Plaintiff], and that discharge was not an inappropriate discipline." Union's letter.

---

[3] Defendant's Exh. K.

[4] Defendant's Exh. L.

## DISCUSSION

**1.    Summary Judgment**

Defendant moves for summary judgment arguing that Plaintiff cannot establish any actionable gender discrimination or hostile work environment claim. In opposition to summary judgment, Plaintiff asserts that she was subjected to Defendant's selectively enforced policy prohibiting the falsification of timesheets and misuse of company time, which resulted in Plaintiff's termination from employment whereas similarly situated male employees were not fired for the same alleged malfeasance. Plaintiff also asserts with respect to the hostile work environment claim that she was ignored on a daily basis and treated as if she did not belong in the workplace based on her gender. In further support of summary judgment, Defendant argues that Plaintiff has not demonstrated any material issue of fact regarding any unlawful employment discrimination. The court considers whether Defendant should be granted summary judgment with regard to Plaintiff's employment discrimination claim or hostile work environment claim.

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain summary judgment. *Celotex*, 477 U.S. at 322.

Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).

**2.    Employment Discrimination—Disparate Treatment**

Title VII makes it "an unlawful employment practice" for an employer to discriminate against an employee because of the employee's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). When a plaintiff alleges disparate treatment with regard to employment, as here, liability depends on whether the protected trait, here, gender, actually motivated the alleged adverse employment action. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). In the instant case, because Plaintiff alleges she was subjected to gender-based discrimination and a hostile work environment based on her gender, Plaintiff must establish that her gender "`actually played a role in [the employer's decision-making process] and had a determinative influence on the outcome.'" *Reeves*, 530 U.S. at 141 (quoting *Biggins*, 507 U.S. at 610 (bracketed material in original)).

Claims of disparate treatment employment discrimination are subject to a burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-507 (1993). The plaintiff bears the initial burden of establishing a *prima facie* case of unlawful discrimination, *id.*,

and the plaintiff's initial burden is said to be "*de minimus*." *Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 202 (2d Cir. 1995). Upon such a showing, the burden of going forward shifts to the employer, who must articulate some legitimate, non-discriminatory reason for the employee's termination or adverse employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Hicks*, 509 U.S. at 507. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves,* 530 U.S. at 143; *Hicks*, 509 U.S. at 507; *Burdine*, 450 U.S. at 253. Thus, to defeat a defendant's properly supported motion for summary judgment, the plaintiff must produce sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's race or, as in this case, gender was the real reason for the discharge or adverse employment action. *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996), *cert. denied*, 520 U.S. 1228 (1997).

To make out a *prima facie* case of employment discrimination under Title VII, a plaintiff must show (1) she is a member of a protected class, (2) she is competent to perform the job or is performing her duties satisfactorily, (3) she suffered a termination of employment or other adverse employment action, and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on her membership in the protected class. *Mario v. P & C Food Mkts.*, 313 F.3d 758, 767 (2d Cir. 2002); *Farias v. Instructional Systems, Inc.*, 259 F.3d 91, 98 (2d Cir. 2001) (citing *Quarantino*, 71 F.3d at 64); *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.), *cert. denied*, 474 U.S. 829 (1985). A plaintiff's burden to establish a *prima facie* case of employment discrimination to defeat summary judgment is *de minimus*, *McLee*, 109 F.3d at 134

(citing cases), and may be established based on either direct or circumstantial evidence. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001) ("direct evidence of discriminatory intent [with regard to employment] is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions*")*; *Luciano v. Olsten Corp.*, 110 F3d 210, 215 (2d Cir. 1997) ("Direct evidence is not necessary, and a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of circumstantial evidence."). Further, as the court may not resolve issues of fact on a summary judgment motion, its determination is limited to "whether the proferred admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *McLee*, 109 F.3d at 135.

Once an employer articulates a non-discriminatory reason for the challenged adverse employment action, "the presumption of discrimination 'drops out of the picture,' . . . . [and] the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James*, 233 F.3d at 154 (quoting *Hicks*, 509 U.S. at 510-11, and citing *Burdine*, 450 U.S. at 255-6). In other words, "the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253).

In the instant case, it is not disputed that Plaintiff can establish the first three prongs of a *prima facie* case being a female who was competent to perform her job as a

14

serviceperson and was terminated from her position. Rather, Defendant maintains Plaintiff is unable to meet the fourth prong because the record establishes that the termination of Plaintiff's employment was not based on her gender. Specifically, Defendant asserts that Plaintiff provides no probative evidence showing that she was terminated from her employment based on her gender as Plaintiff's own testimony reveals that her gender discrimination claim was based on a "feeling." (Campbell Tr. 122). Defendant further submits that, even if Plaintiff could make out a *prima facie* case of discrimination, Defendant had legitimate, non-discriminatory reasons for terminating Plaintiff's employment in that the undisputed evidence showed that she misused her time, falsified her timesheet to cover up her misuse of time, and then lied about her actions. Defendant argues that such reasons shift the burden of proof back to Plaintiff who is unable to demonstrate such legitimate explanations are mere pretext for discrimination.

In response, Plaintiff maintains she suffered a number of adverse employment actions, contending Defendant selectively enforced its policy prohibiting the falsification of timesheets and misuse of company time in favor of similarly situated male employees and ignoring common practices of employee time-keeping. Plaintiff's Memorandum at 4-21. Defendant maintains that none of the male employees identified by Plaintiff in her response were similarly situated to Plaintiff as required to establish an interference of discrimination, and that the undisputed evidence shows that Jandreau did not discriminate against Plaintiff based on her gender, asserting that Defendant's record of terminating employees for misuse of time, falsification of records, and lying, regardless of gender, negates Plaintiff's employment discrimination claims. Defendant's Reply at 5-

14. As such, Defendant claims that none of the alleged conditions of Plaintiff's employment constitute an adverse employment action supporting employment discrimination. *Id.* at 7-11.

Because the first three elements for a *prima facie* case of gender-based discrimination are not disputed, the court addresses only the fourth element, *i.e.*, whether there is evidence in the record on which a reasonable jury could find that Plaintiff was treated differently than similarly situated male employees. In cases claiming selective treatment based on membership in a protected class, plaintiffs must "demonstrate that they were treated differently from similarly situated individuals who were not in the protected class." *Henry v. Daytop Village, Inc.*, 42 F.3d 89, 96-97 (2d Cir. 1994); *Mosdos Chofetz Chaim, Inc. v. Vill. Of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011). Here, based on the evidence in the record, Plaintiff is unable to establish an adverse employment action with regard to her assertion that Defendant selectively enforced its policy prohibiting the falsification of timesheets and misuse of company time in favor of similarly situated male employees. In particular, Plaintiff has not established that the employees whom she alleges received more favorable treatment than Plaintiff were similarly situated as required to support an inference of discrimination or pretext.

"To be 'similarly situated,' the individuals with whom [a plaintiff] attempts to compare herself must be similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). This means the other employees "must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have

engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." *Hines v. Hillside Children's Ctr.*, 73 F. Supp. 2d 308, 318-19 (W.D.N.Y. 1999).

Here, Plaintiff identified Serviceperson Timothy Hacic ("Hacic") as being similarly situated to Plaintiff and receiving lesser discipline for similar work transgressions. Plaintiff's Response at 9. Specifically, Hacic, who also reported to Jandreau during the relevant time period, received a five-day unpaid suspension for making a personal stop at Tops Supermarket to cash a paycheck on the job. *Id.* at 9-10. Although Plaintiff contends Hacic misused company time, there is no evidence in the record that he falsified company records or lied when questioned about his conduct. *Id.* Therefore, Hacic cannot be considered similarly situated to Plaintiff. Plaintiff also identified Jerry King ("King"), a serviceperson who reported to Jandreau, as being similarly situated. *Id.* at 10. King received no discipline after a member of the public accused him of engaging in conduct other than what was indicated on his timesheet. *Id.* In other words, King allegedly misused time and falsified his timesheets. However, Defendant was unable to verify the accusation against King by the member of the public who reported it. Defendant's Reply at 7. Unlike King, Plaintiff was observed engaging in misconduct by Jandreau, not an unidentified member of the public. Therefore, King cannot be considered similarly situated to Plaintiff. Plaintiff attempts to identify other male employees whom she contends were treated differently despite being caught committing similar offenses, yet those employees did not work in the same service center as Plaintiff, nor did they work for Jandreau, Plaintiff's supervisor. Plaintiff's Response at 8-9.

In response to Plaintiff's assertions, Defendant identified Serviceperson Lori Mee ("Mee"), who was issued a written warning for "falsifying records, among other troubling conduct," but was not terminated. Defendant's Reply at 7. Defendant maintains the disciplinary action taken against Mee, taken together with the disciplinary actions taken against Hacic and King, establishes consistent treatment of male and female employees who report to Jandreau, and that, as such, Plaintiff cannot claim that these employees are similarly situated to her. *Id.*

Defendant asserts that, even if Plaintiff could provide evidence that similarly-situated male employees engaged in the same conduct as her but were not terminated, Defendant's record of terminating male employees for falsification of records, misuse of time, and/or lying negates any inference of discrimination. Defendant's Memorandum at 20. Defendant has tightened its actions in response to these types of infractions, terminating twenty-seven male employees for falsification of records, misuse of time, and/or lying between 2008 and 2013. *Id.* In contrast, Defendant asserts that Plaintiff was the only female terminated during that time period for those offenses, and her termination, as opposed to a warning, was because she committed all three offenses. *Id.* at 21. In summary, Defendant claims that its disciplinary records over that period of time show that it repeatedly terminated employees for falsification of records, misuse of time, and/or lying. *Id.* While conceding that Defendant had been more lenient in the past regarding these offenses, an assertion corroborated by Canfield, *see* Canfield Declaration ¶¶ 10, 15, 21, Defendant claims that there is no correlation between the leniency previously allowed and any particular employee's gender. Defendant's Memorandum at 21.

18

Plaintiff does not dispute these particular employment actions, upon which Defendant relies, but contends that Defendant's change in level of disciplinary actions since 2008 raises a serious factual question regarding who was disciplined and the gender of those disciplined. Plaintiff's Memorandum at 8-9. Specifically, Plaintiff names certain male employees who were not terminated during that time period for actions such as falsifying company records, misusing time, and/or lying, *id.*, yet Plaintiff concedes there are no instances where these male employees were charged with committing all three offenses. Sanders Declaration ¶¶ 27-35.

"A pattern where the protected-class members 'sometimes do better' and 'sometimes do worse' than their comparators is not evidence of … discrimination." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 643 (7th Cir. 2008). Here, Plaintiff has identified a few employees who were subject to disciplinary action different than that of Plaintiff, but Plaintiff points to no evidentiary showing that these employees committed all of the same offenses at the same time as Plaintiff such that Defendant treated comparatively situated employees differently based on gender. As such, the court finds that, based on the facts in the record, Plaintiff has failed to make out a *prima facie* case of gender discrimination.

Further, even if Plaintiff could make out such a case of discrimination, the undisputed facts show that Defendant had legitimate, non-discriminatory reasons for terminating Plaintiff's employment. Defendant's Memorandum at 22-23. Plaintiff does not dispute that the actions for which she was terminated occurred and admits that, on the day in question, she made several personal stops in violation of Defendant's work rules, including stops at Tim Hortons, OfficeMax, her home, and her mother's home.

Campbell Declaration ¶¶ 91, 98, 128. It is also not disputed that, when questioned

regarding these personal stops, Plaintiff did not initially admit to the misuse of company

time. *Id.* at 130. Falsification of timesheets has been held to constitute a legitimate, non-

discriminatory reason for termination of employment. *See Droutman v. N.Y. Blood Ctr.*,

No. 03–CV–5384(DRH/ARL), 2005 WL 1796120, at *8 (E.D.N.Y. July 27, 2005) (stating

that "an employee's falsification of her time sheets, reported hours, or attendance

records is an undeniably legitimate and non-discriminatory reason for terminating her").

Similarly, a misuse of company time has also been held to be a legitimate, non-

discriminatory reason for terminating an individual's employment. *See McAllister v.

Price Rite*, No. 3:09–CV–01888 VLB, 2013 WL 5187036, at *12 (D. Conn. Sept. 13,

2013) (stating that the fact that an employee had routinely taken breaks while on the

clock constituted theft of time and violating company policy articulated a legitimate, non-

discriminatory reason for terminating an individual's employment). Finally, lying to an

employer has also been held to be a legitimate reason for terminating an individual's

employment. *See Rodriguez v. Long Island Am. Water, Inc.*, No. 12–cv–

2970(JFB)(ARL), 2014 WL 4805021, at *5  (E.D.N.Y. Sept. 26, 2014). In this case,

because the undisputed facts show that Plaintiff committed all of the above offenses,

the court finds that the Defendant had a legitimate, non-discriminatory reason for

terminating Plaintiff's employment, and no reasonable jury could find otherwise.

Finally, as Defendant has been found to have had a legitimate, non-

discriminatory reason for terminating Plaintiff's employment, the burden shifts back to

Plaintiff to produce evidence that the non-discriminatory reasons were a mere pretext

for actual discrimination. *Weinstock v. Columbia Univ.*, 224 F. 3d 33, 42 (2d Cir. 2000),

cert. denied, 540 U.S. 811 (2003). It is well settled that an employer's decisions are given deference by the court unless they are clearly pretextual. *Deabes v. Gen. Nutrition Corp.*, 415 Fed. Appx. 334 (2d Cir. Mar. 24, 2011) ("Even if the record, viewed in the light most favorable to [plaintiff], contains inconsistent testimony concerning [the reason for adverse action], this is insufficient to create a genuine issue of material fact, as [plaintiff] has pointed to no evidence that would permit a rational factfinder to infer that [defendant] was motivated by unlawful discriminatory intent.").

Here, while Plaintiff does not dispute any of the underlying offenses for which she was terminated, she asserts that the same offenses did not result in the termination of male employees, and that, as such, Defendant's actions were mere pretext for terminating her employment while retaining the male employees. Plaintiff's Memorandum at 20-21. Plaintiff asserts that Jandreau was actively involved in her termination in that his investigation and information sharing led to Plaintiff's firing, as opposed to his actions in relation to other employees where he simply warned them and did not report their actions to higher management. *Id.* However, as discussed in connection with Defendant's legitimate, nondiscriminatory reasons for terminating Plaintiff's employment, Discussion, *supra*, at 20, the record simply does not support any inference that any other male employee committing all of the offenses as did Plaintiff was subjected to a less stringent disciplinary standard by Jandreau. Accordingly, the court concludes that Defendant's actions were not mere pretext for actual discrimination.

3.    **Hostile Work Environment**

Plaintiff alleges the discrimination she endured while working in the position of Serviceperson became so severe as to create a hostile work environment. Amended Complaint ¶¶ 32-36. Defendant argues in support of summary judgment that Plaintiff cannot establish a hostile work environment claim based on the alleged conduct of Plaintiff's supervisor, Jandreau. Defendant's Memorandum at 26-29. According to Defendant, Plaintiff's allegations regarding Jandreau's conduct, including refusing to acknowledge or communicate with Plaintiff, failing to notify Plaintiff about safety meetings, and speaking to Plaintiff in a demeaning way, cannot be attributed as animosity toward a particular gender because Jandreau treated all employees in the same, stern manner. *Id.* at 27. Defendant maintains Jandreau's conduct, even if it could be connected to Plaintiff's gender, was not severe or hostile enough to establish a viable hostile work environment claim. *Id.* at 27-28. Defendant further maintains the conduct of which Plaintiff complains cannot be imputed to Defendant. *Id.* at 28-29. In opposing summary judgment, Plaintiff contends Jandreau subjected Plaintiff to a hostile work environment when Jandreau ignored Plaintiff every day, abruptly assigned work to Plaintiff instead of more fully communicating with Plaintiff regarding the assignment, and generally gave Plaintiff the "cold shoulder treatment" in comparison to male employees. Plaintiff's Response at 23-24. Plaintiff contends Jandreau's conduct should be imputed to Defendant. *Id.* at  24-25.

A hostile work environment claim is established if the plaintiff demonstrates that (1) the alleged harassment was sufficiently severe or pervasive to materially alter the conditions of the victim's employment and create an abusive working environment, and

(2) creates a specific basis for imputing the conduct creating the hostile work environment to the employer. *Feingold v. New York*, 366 F.3d 138, 149-50 (2d Cir. 2004) (citing *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)). *See also Allessi v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F. Supp. 3d 221, 228 (W.D.N.Y. 2014) (Skretny, J.) (citing *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)). Factors to be considered include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance.'" *Feingold*, 366 F.3d at 150 (quoting *Harris*, 510 U.S. at 23). When a hostile work environment claim is alleged, such claim is "based on the cumulative effect of individual acts." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). Further, "[a]s a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Feingold*, 366 F.3d at 150 (quoting *Alfano*, 294 F.3d at 374). However, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano*, 294 F.3d at 374.

"The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact," *Holtz*, 258 F.3d at 75; however, summary judgment may be granted on such a claim where no reasonable factfinder could conclude, considering all the circumstances, that the alleged harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment were altered for the

worse as a result of one of the forms of discrimination prohibited by Title VII. *Schiano v Quality Payroll Systems, Inc.*, 445 F.3d 597, 600 (2d Cir. 2006). Further, even if based on the race, color, religion, sex, or national origin of a plaintiff, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Baton Rouge*, 524 U.S. 775, 788 (1998). Rather, "[t]he incidents of allegedly offensive conduct must also be 'more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Holtz*, 258 F. 2d at 75 (quoting *Perry v. Ethan Allen, Inc.*, 115 F. 3d 143, 149 (2d Cir. 1997)).

The standard for establishing a hostile work environment is high, yet, "the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.*'" *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F. 3d 62, 70 (2d Cir. 2000) (italics in original)). Although to support a hostile work environment claim, the environment need not be unendurable or intolerable, that the law requires the harassment be severe or pervasive to be actionable "does not mean that employers are free from liability in all but the most egregious cases." *Whidbee*, 223 F. 3d at 70. In the instant case, the conduct of which Plaintiff complains is insufficient to support a hostile work environment claim.

The record shows that the only employee of Defendant of whom Plaintiff complains was her supervisor, Jandreau. Defendant's Memorandum at 15. Plaintiff, however, testified at her deposition that Jandreau did not make any gender-related comments to her or anyone else, told no gender-related jokes, and, in fact, made no

gender related references at all. Defendant's Exhibit A at 121-122. Although unartfully pleaded, Plaintiff alleges that the work environment was hostile as Jandreau ignored her, refused to acknowledge or communicate with her, failed to train her, failed to notify her of meetings, and generally spoke to her in a derogatory manner. Amended Complaint ¶¶ 10-12. Specifically, Plaintiff asserts that Jandreau engaged in a nearly three-year period of isolation toward her that resulted in him causing her termination. Plaintiff's Memorandum at 22-23. Plaintiff admits that being ignored may not appear to be severe, hostile treatment, but that when confronted with such behavior every day, it created an atmosphere that a reasonable person would find abusive or hostile. *Id.* at 24.

 Even if Plaintiff's allegations are true, nothing in the record connects Jandreau's conduct to Plaintiff's gender, as Plaintiff argued that Jandreau treated all employees in the same, stern manner. Defendant's Exhibit A at 121-122. If Jandreau treated all employees the same as Plaintiff, then Plaintiff was not singled out at all, let alone based on her gender. *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("An environment which is equally harsh for both men and women…does not constitute a hostile working environment under the civil rights statutes.").

Even if Jandreau's conduct could be connected to Plaintiff's gender, courts have held that conduct similar as that alleged is not sufficiently severe or pervasive to establish a hostile work environment claim. *See Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 680 (S.D.N.Y. 2011) (holding that allegations that supervisors smirked and laughed at plaintiff and her pronunciation of words, criticized her manner of speech, ridiculed her speech, ignored her in meetings, and micromanaged her work were insufficiently severe or pervasive to establish a Title VII hostile work environment

claim); *Simpson v. Metro-North Commuter R.R.*, No. 04 Civ. 2565(PAC), 2006 WL 2056366, at *9 (S.D.N.Y. July 20, 2006) (dismissing hostile work environment claim based on allegations that the plaintiff's "supervisors yelled at him unnecessarily, spoke to him in a disrespectful tone, and 'micromanaged' his work"); *Paddock v. SUNY Brockport*, 418 F. Supp. 2d 288, 293 (W.D.N.Y. 2006) ("[E]ven when these [race-related comments] are considered in conjunction with plaintiff's other allegations that [her immediate supervisor] was rude to her, gave her threatening looks, and spoke to her in a confrontational tone, plaintiff still has not made out a hostile work environment."). In short, a reasonable jury could not conclude that Jandreau created a hostile work environment abusive to Plaintiff based on her gender.

Moreover, even if Plaintiff were subjected to a hostile work environment by Jandreau, such conduct cannot be imputed to Defendant. To prevail on a hostile work environment claim against Defendant, Plaintiff must demonstrate a specific basis for imputing the conduct of which she complains to Defendant. *Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2d Cir. 2004) (citing cases). Where a hostile work environment is attributed to a supervisory authority over the employee, the court first looks "to whether the supervisor's behavior culminated in a tangible employment action against the employee." *Id.* (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (internal quotation marks omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 624 U.S. at 761. If behavior in violation of Title VII "culminates in a supervisor's tangible employment action, the employer will, ipso

facto, be vicariously liable for it." *Mack v. Otis Elevator Company*, 326 F.3d 116, 124 (2d Cir. 2003).

Although there is no dispute that Plaintiff experienced a tangible employment action, *i.e.*, termination from her employment, an employer can avoid vicarious liability for a hostile work environment created by a supervisor by showing that: (1) it took reasonable steps to prevent and remedy harassment; and (2) the plaintiff unreasonably failed to take advantage of any corrective or preventative opportunities provided by the employer or failed to avoid harm otherwise. *See Faragher*, 524 U.S. at 807; *Burlington Industries, Inc.*, 524 U.S. at 765. One way to satisfy the first prong of this defense is by maintaining an anti-harassment policy. *See Woodcock v. Montefiore Med. Ctr.*, No. 98–CV–4420(ILG), 2002 WL 403601, at *7 (E.D.N.Y. Jan. 28, 2002). Here, Defendant maintained a readily available anti-harassment policy throughout Plaintiff's employment that instructed employees to report such incidents either to an immediate supervisor or Amy L. Shiley, Assistant General Manager at Defendant's Human Resources Department. Defendant's Exhibit D. Plaintiff knew of this anti-harassment policy and signed an acknowledgement that she received the policy as recently as February 2, 2011, but never reported or complained about any harassing conduct. Disare Affidavit Exhibits E, G; Defendant's Exhibit A. As such, Plaintiff failed to avail herself of Defendant's preventative measures, and, considering the totality of the circumstances, the court finds no basis to impute the conduct allegedly creating a hostile work environment to Defendant requiring trial. *Feingold*, 366 F.3d at 150.

**<u>CONCLUSION</u>**

Based on the foregoing, Defendant's motion for summary judgment (Doc. No. 28) should be GRANTED; the Clerk of the Court should be directed to close the file.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:    July 26, 2016
             Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

Thomas v. Arn, 474 U.S. 140 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); Wesolek v. Canadair Limited, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      July 26, 2016
            Buffalo, New York